UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 12-60298-CR-BLOOM/VALLE

**UNITED STATES OF AMERICA**,

v.

**RAEES ALAM QAZI,** and
**SHEHERYAR ALAM QAZI**,

    Defendants.

_____/

## ORDER

**THIS CAUSE** came before the Court on Defendant Sheheryar Alam Qazi's Motion to Exclude Martial Confidential Communications, ECF No. [43] (the "Motion"). The Motion was previously referred to the Honorable John J. O'Sullivan. *See* ECF No. [262]. On December 15, 2014, Judge O'Sullivan issued a Report and Recommendation, which recommended that the Motion be denied. *See* ECF No. [264]. Defendant Sheheryar Alam Qazi has filed objections to the Report. *See* ECF No. [265]. The Court is fully advised after having considered Judge O'Sullivan's Report, Defendant Sheheryar Alam Qazi's objections, the record,[1] and the applicable law.

    **I.**    **Background**

On November 30, 2012, a grand jury indicted Defendants each with one count of conspiring to provide material support to terrorists, in violation of 18 U.S.C. § 2339A(a), and one count of conspiring to use a weapon of mass destruction, in violation of 18 U.S.C.§ 2332a(a), for actions they allegedly took beginning no later than July 2011, and continuing through November

---

[1] As part of the Court's *de novo* review, the Court obtained a copy of the sealed affidavit of FBI Special Agent Paul Carpinteri, dated December 6, 2012, which was submitted to Magistrate Judge Jonathan Goodman in Case No. 12-03588-MJ-GOODMAN-1. Moreover, the Court reviewed the transcripts ordered and received. ECF Nos. [266], [269].

29, 2012.  *See* ECF No. [1].  On January 16, 2015, a superseding indictment charged Defendants each with additional counts for actions they allegedly took beginning no later than July 2011, and continuing through November 29, 2012—including providing and attempting to provide material support to terrorists, in violation of 18 U.S.C. § 2339A(a); conspiring to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1); and attempting to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1).  Defendants were also each charged with conspiring to forcibly assault a federal employee, in violation of 18 U.S.C. § 371; forcibly assaulting a federal employee, in violation of 18 U.S.C. § 111(a)(1); and attempting to murder a federal employee, in violation of 18 U.S.C. § 1114(3)—in relation to an incident which occurred on or about April 8, 2014.  *See* ECF No. [267].

Defendant Sheheryar Alam Qazi filed the Motion on April 5, 2013—seeking to prevent the Government from introducing into evidence statements which, he asserts, would violate the marital confidential communications privilege.  The statements took place during three telephone conversations between Defendant Sheheryar Alam Qazi and his wife on August 29, September 7, and September 10, 2012.

On December 15, 2014, Judge O'Sullivan issued a Report and Recommendation, recommending that the Motion be denied.  Judge O'Sullivan explained:

> The conversations discussed in the fact section of this Report clearly demonstrate that Sheheryar's wife knew of Raees' illegal conduct.  She assisted him in preparing for his alleged violent acts by providing him a place to stay and concealed his activities from others when he left for New York.  Sheheryar's wife aided and abetted in the crimes for which Sheheryar and Raees have been charged and is an unindicted co-conspirator in those crimes.  The conversations described above between Sheheryar and his wife relating to the activities of Raees during the conspiracy are not protected by the marital communications privilege and the government should not be prohibited from introducing those statements at trial.

ECF No. [264] at 3.  Defendant Sheheryar Alam Qazi objected to Judge O'Sullivan's factual findings and legal conclusions.  ECF No. [265] at 2.  Specifically, Defendant Sheheryar Alam Qazi objected to Judge O'Sullivan's factual findings "that his wife willfully assisted Raees in preparing for his alleged violent acts and that she aided and abetted in the crimes alleged in this indictment and that she is a co-conspirator in those crimes." *Id.*  Defendant Sheheryar Alam Qazi also objected to Judge O'Sullivan's legal conclusion "that the conversations between Sheheryar and his wife relating to the activities of Raees are not protected by the marital communications privilege and the government should not be prohibited from introducing those statements at trial." *Id.*

The Court ordered the Government to file a full transcript of any conversations the Government seeks to introduce at trial, and ordered Defendant Sheheryar Alam Qazi to file a report stating exactly which conversations and statements are the subject of the Motion.  *See* ECF No. [266].  The Government provided six transcripts of conversations that took place on August 24, August 29, September 7, September 10, and November 24, 2012.  *See* ECF No. [269].  The Government also clarified that other conversations may be submitted, but those conversations were made in the presence of third parties, so the martial confidential communication privilege would not apply.  *See id.*  Defendant Sheheryar Alam Qazi clarified that he "seeks to suppress all portions of each of the six conversations," *see* ECF No. [270] at 1 (citing ECF Nos. [269-1] through [269-6]), and agreed that the marital confidential communication privilege does not apply to communications made in the presence of third parties. *Id.*

3

## II. Legal Standard

The Federal Magistrates Act provides that a magistrate judge may be referred, in order to submit proposed findings of fact and recommendations for the disposition of, motions to suppress evidence in a criminal case. *See* 28 U.S.C. § 636(b)(1). A party may object to these proposed findings and recommendations, and the Court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id. See also Williams v. McNeil*, 557 F.3d 1287, 1291 (11th Cir. 2009).

## III. Discussion

"There are two recognized types of marital privilege: the martial confidential communications privilege and the spousal testimonial privilege." *United States v. Singleton*, 260 F.3d 1295, 1297 (11th Cir. 2001) (acknowledging recognition of the marital privilege in the Eleventh Circuit) (citations omitted). The marital confidential communications privilege, the asserted basis of Defendant's Sheheryar Alam Qazi's motion to suppress, "excludes information privately disclosed between husband and wife in the confidence of the marital relationship." *Harrison v. United States*, 577 F. App'x 911, 913 (11th Cir. 2014) (citing *Trammel v. United States*, 445 U.S. 40, 51 (1980)). There is a presumption that communications within a marriage are confidential. *See Singleton*, 260 F.3d at 1299 (citing *Blau v. United States*, 340 U.S. 332 (1951)). "However, the privilege does not apply to communications made in the presence of third parties, and generally applies to statements, not acts." *Harrison*, 577 F. App'x at 913 (citing *Pereira v. United States*, 347 U.S. 1, 6 (1954)). "It also does not apply to conversations between husband and wife about crimes in which they are jointly participating." *United States v.*

*Abram*, 171 F. App'x 304, 310 (11th Cir. 2006) (citing *United States v. Entrekin*, 624 F.2d 597, 598 (5th Cir. 1980)).[2]

The Government argues that the conversations in question are not privileged because "throughout the period when Raees lived with Sheheryar and his wife, Sheheryar's wife purchased food, cooked meals for him and maintained the home that he shared with the family, affording Raees the freedom to conduct research and develop his violent plans." ECF No. [260] at 7. The Government asserts that Defendant Sheheryar Alam Qazi's wife was "not only aware of his activities, but assisted in maintaining an environment in which he could prepare for an attack, and then concealed his activities from others once he left for New York City to select his target. Although not charged in this case, she is an unindicted coconspirator." *Id.* The Government cites *United States v. Short*, 4 F.3d 475, 478 (7th Cir. 1993), in support of this argument, asserting that "the exception applies even if the defendant's spouse plays only a minor role in assisting the crime, such as by preparing forms or helping to conceal the crime." ECF No. [260] at 4.

In *Short*, two defendants, Short and Bittis, were charged with, and eventually convicted of, two crimes: (1) knowing and unlawful possession of, with the intent to sell, motor vehicles bearing altered Vehicle Identification Numbers (VINs); and (2) conspiring to remove, obliterate, tamper with, and alter the VINs. The conspiracy involved a scheme in which the two defendants would buy older vehicles at auctions or salvage yards, steal newer cars of the same make and model, and place the VIN numbers of the older salvaged cars on the newer stolen ones— preparing fake title documents to sell the vehicles. Short's then-wife prepared the fraudulent title, registration, and transfer documents, and the two defendants would solicit buyers.

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

Before trial, the government moved in limine to introduce testimony of Short's ex-wife, who had since divorced Short and was given a grant of immunity to testify. Short objected to the admission of portions of his ex-wife's testimony on the grounds of the martial confidential communications privilege, but the district court granted the government's motion, to the extent that the government could demonstrate the applicability of an exception at trial. On appeal, Short challenged the admission of portions of his ex-wife's testimony that did not fall under the observation exception or the presence of third parties exception—arguing that for three portions of the testimony, the government had not shown that the ex-wife was a joint participant in the commission of the crime.

Affirming the district court's admission of the testimony, the Seventh Circuit analyzed the extent of the ex-wife's involvement in the conspiracy, and the timing of her participation. *See Short*, 4 F.3d at 478-79. In analyzing the ex-wife's involvement, the court noted that she was not indicted and the government did not describe her as an unindicted conspirator. However, the fact that she prepared the necessary documents, helped conceal the crime by suggesting how to paint over an identifying feature of a stolen car, and helped her husband replace car parts "confirm[ed] the government's theory that while she played a minor role, she nonetheless aided and abetted the conspiracy to a sufficient extent that the marital communication privilege did not apply to all of her testimony." *Id.* at 479. The court noted, however, that two of the three portions posed concerns because of when they were made. Initially, the ex-wife prepared the title documents believing they were legal, and "witnessed the car theft with approbation." *Id.* The court explained that the ex-wife had "only gradually became a joint participant, in the sense that she knowingly aided and abetted the conspiracy," and "[t]wo of the three statements offered under the joint participant exception concern disclosures by her husband which may have

6

occurred before she joined in the crime." *Id.* Though declining to fully address the issue because admitting the statements was harmless, even if an error, the court noted that "just as a martial communications privilege continues to protect pre-divorce disclosures by an ex-spouse, so might the privilege protect disclosures made before the spouse becomes a joint participant in the crime." *Id.* (citing *United States v. Byrd*, 750 F.2d 585, 591 (7th Cir. 1984) (the survival of the privilege after divorce assures spouses that their marital communications will never be disclosed)).

The Seventh Circuit later affirmed this possibility: "we think that the approach foreshadowed in *Short* is the correct one. The initial disclosure of a crime to one's spouse, without more, is covered by the marital communications privilege. If the spouse later joins the conspiracy, communications from that point certainly should not be protected." *United States v. Westmoreland*, 312 F.3d 302, 308 (7th Cir. 2002). A number of other circuits have indicated agreement with drawing a distinction between communications made before and after joint criminal activity has been undertaken. *See United States v. Vo*, 413 F.3d 1010, 1017 (9th Cir. 2005) ("The exception has its own limits: Where, for example, the wife has not become a participant at the time of her communications, no joint criminal activity has been undertaken, and the joint criminal activity exception does not apply.") (citations and internal quotation marks omitted); *United States v. Bey*, 188 F.3d 1, 6 (1st Cir. 1999) ("Our review of the case law, however, reveals that a court may admit relevant confidential marital communications that take place after the spouse has become a joint participant in the criminal activity.").

Other circuits have not definitively so stated, but have shown agreement with the significance of timing in determining whether a statement is privileged. *See United States v. Estes*, 793 F.2d 465, 468 (2d Cir. 1986) (holding that ex-wife's testimony concerning

7

defendant's initial disclosure of crime should not have been admitted but not an error to admit testimony once she became "an accessory after the fact") (citing potential conflict with *United States v. Neal*, 743 F.2d 1441 (10th Cir. 1984)); *United States v. Evans*, 966 F.2d 398, 401 (8th Cir. 1992) ("Only where spouses engage in conversations regarding joint ongoing or future patently illegal activity does the public's interest in discovering the truth about criminal activity outweigh the public's interest in protecting the privacy of marriage.") (quoting *United States v. Sims*, 755 F.2d 1239, 1243 (6th Cir. 1985)). *But see United States v. Parker*, 834 F.2d 408, 413 (4th Cir. 1987) ("We find no basis for making a distinction between marital communications that involve the initial discussion and commencement of joint criminal conduct between spouses, and marital communications made during the joint participation in that criminal conduct. The effect of such a distinction, if any, on the marital relationship would be *de minimis*."); *United States v. Hill*, 967 F.2d 902, 911-12 (3d Cir. 1992) (drawing no distinction).

Here, the Government imputes Defendant Sheheryar Alam Qazi's wife's knowledge—at the time the conversations in question took place—of her brother-in-law's criminal plans from several sources: (1) a statement she made to her husband during a conversation on August 29, 2012; (2) a statement made by her father to her during a conversation on September 6, 2012; and (3) a statement Defendant Sheheryar Alam Qazi made to his wife during a September 10, 2012 conversation.

The Government explains that during the August 29, 2012 conversation, Defendant Sheheryar Alam Qazi and his wife were having a conversation about their limited household finances, and during that conversation, she stated:

> Now . . . even if he is going for Jihad too, you know . . . Right? Even so, he needs to do some hard work. He should not ask others for help. Have you understood? All the boys who go . . . with them . . . one can help each other out. One should pay for one's own expenses.

8

ECF No. [260] at 5. The Government further highlights that she stated: "make this kid get this realization. Tell him, 'You do a job . . . up to the time you are staying here on a temporary basis . . . earning here is written into his destiny by God." *Id.* The Government points out that Defendant Sheheryar Alam Qazi "did not want him to work." *Id.* at n.2. During the September 6, 2012 conversation, "her father encouraged her to go to the police and tell them that her husband is a friend of the Taliban and that Raees was a 'Talib.' Her father continued: 'I do not want this thing here. He is a Talib and does fund raising here. He is Taliban from Afghanistan." *Id.* at 5-6.

During the September 10, 2012 conversation, the Government explains that Defendant Sheheryar Alam Qazi instructed his wife not to tell his mother about his brother because he felt sorry for him, and that his mother had no knowledge of the activities of the Qazi brothers. In that same conversation, the Government highlights that Defendant Sheheryar Alam Qazi told his wife that his brother was "fed up with this world," is "just like a guest in this world," and that:

> In a way, he has given up on himself and is waiting for a-a-a . . . because that is why he does not try to get . . . uh . . . doesn't get a permanent job so that, "I don't get too tied up with something else and forget about God's work . . . I don't let his happen . . . uh . . . so I don't get interest (sic) in worldly matters.

*Id.* The Government explains that "God's work", in this context, means violent jihad. *See id.* As for the involvement of Defendant Sheheryar Alam Qazi's wife, the Government asserts that she "assisted in maintaining an environment in which he could prepare for an attack," and after Defendant Raees Alam Qazi left for New York City on November 23, 2012, which the government asserts was to select a target for his violent jihad, Defendant Sheheryar Alam Qazi and his wife concealed his whereabouts and activities pursuant to his written request. *See id.* at 7.

Upon review of the full transcripts of the marital communications at issue, and assessing the time during which some of them were made, the Court finds an insufficient basis to rule that the joint participant exception to the marital confidential communications privilege applies to all of the statements. For example, during the conversation on August 29, 2012, Defendant Sheheryar Alam Qazi and his wife discuss wanting to leave the United States and live in Pakistan. She states: "Very bad . . . the situation is very bad over here . . . at least . . . which is the one . . . if you have your own business there . . . have your own house, you know. This house is not our house."[3] ECF No. [269-4] at 3. He responds:

> That is why I want to do this thing, you know . . . No . . . that house is our house and even nobody's father can snatch it from us. . . . This mulvi Durrani etc. . . . which is the one . . . [unintelligible]. I haven't got it but . . . but .—storage [. . .] even now there is a handgun lying with Adalee [. . .] I will tell Adalee, 'remove the rust from it so we can fire it a bit. So we should fire a few shots in the air' . . . and there will be a person [unintelligible].

*Id.* His wife tells him "No buddy. That is not the issue, Sheheryar. The issue is this that however much life is here, our lives would not be peaceful here." *Id.* The Court finds that the content of this conversation is insufficient to show that she was aware of anything relevant to the alleged conspiracy between the Qazi brothers.

During the conversation on August 29, 2012, Defendant Sheheryar Alam Qazi and his wife started talking about household finances and her desire to save money to live in Pakistan, and the conversation turned to Defendant Raees Alam Qazi. She states:

> If you save enough money, then you can think intelligently . . . "I will buy a house there; will get some business started, you know". That is why I was saying that Shan is with us at home; he needs to help you. I observe him all day long he is sitting useless at home; gets fed up . . . he gets bored, thinking, "God what should I do?". Sometimes he gets himself this thing on the furniture . . . I observe it that if one . . . his own hard work . . . Now for example God . . . even if he goes for Jihad too, you know . . . Right? Even so, he needs to do some hard work. He

---

[3] The transcript's distinctions between which languages were used and the translator's notes have been omitted from the excerpts quoted in this Order. *See* ECF No. [269-1] at 1 (showing legend for reading transcripts).

> should not ask others for financial help. Have you understood? All the boys who go, [. . .] with them . . . one can help each other out. One should pay for one's own expenses. If your brother is poor . . . if your brother is himself dependent upon others, how would he be able to help you? Will you then hold your hand out to others saying, "give me some money; help me"? God bless him, he is a grown man; he is not a kid. You guys call him a kid . . . a kid. He knows everything. Find him a job at a kosher place; I know he gets tired. He gets bored with work very easily.

ECF No. [269-1] at 7. She continues:

> That's why I was saying that a human being is like that. There is Shan, he should have taken care of his mother. He should have paid her money for expenses . . . or paid some money to brother Ali . . . give him a hundred rupees saying, "Our mother is here, you know". Have you understood? [. . .] So, you would be looking at him proudly, you know. So, make this kid get this realization. Tell him, "You do a job . . . up to a time you are staying here on temporary basis . . . Earning here is written into his destiny by God. Now you are unable to even do any flying. So . . . what is it . . . you should at least do something. Do not sit idle.

*Id.* at 9. The Government interprets her references to "even if he goes for Jihad," and to him "staying here on a temporary basis" as evidence that she had knowledge of his plans to execute violent jihad, and that, by providing him with food and shelter, she was a co-conspirator. These statements when taken in context, however, show that, at best, she may have had an awareness of his desire to "go to Jihad," but the content of this conversation is insufficient to show that she was aware that any actual plans existed, let alone that she was complicit with or supported them.

During the September 7, 2012 conversation, Defendant Sheheryar Alam Qazi tells his wife that his brother showed him a letter on a computer which someone had sent him, and states "A [untintelligble] had sent it." ECF No. [269-2] at 37. He describes to her a conversation during a sermon at Masjid-e-Nabawi between an old man and another person, who narrated a dream about Osama Bin Laden to the old man after telling him "give me permission so I may go." *Id.* at 39. He told his wife that this conversation involved "going to prepare an army for Imam Mehdi," "prepar[ing] a force for him," fighting "for the sake of God," and that "we are

11

waging an Islamic war." *Id.* at 44. Just before getting another phone call, toward the end of the conversation, he told his wife that "he has started a charity in the name of Osama, you know, in Somalia. Twenty six thousand or so people . . . they arrange to provide food for . . . They arrange there." *Id.* at 45. Her responses during this exchange were nothing more than acknowledgements. *See* ECF No. [269-2] at 37-45 ("Yeah?" "O.K." "Hmm."). The Court finds that even if, just the day before, the father of Defendant Sheheryar Alam Qazi's wife told her that her brother-in-law was a "Taliban from Afghanistan," there is insufficient evidence from this conversation to show that she was aware of any actual plans to commit Jihad in existence, let alone that she was complicit with or supported them.

During the September 10, 2012 conversation, Defendant Sheheryar Alam Qazi talks with his wife about a conversation between his wife and his brother. He says:

> This thing . . . uh . . . you should not have told Shan everything . . . all about what mother said. That poor guy [pause], sometimes I feel so sorry for the poor guy. The poor guy . .. uh . . . is very a very sensitive person and how my mother deals with him, you know . . . I am absolutely not . . . uh . . . over this –

ECF No. [269-3] at 2. He continues: "But when Shan . . . you think about it yourself, when Shan hears these things that, 'oh, my mother got upset with me over this thing . . . I got my mother upset over this [. . .] He has regrets over this issue." *Id.* at 3. His wife responds:

> I . . . Like, I told mother that, "you should have made him understand properly, you know" . . . like, "child! I am living in my son-in-law's house now, you know". Like in a way, there was truth too. I said, the issue is, "you needed to make your son understand in the appropriate way, you know." I said, "you should have done that". She told me, "these are not really such kids of mine. He has left my house, you know". She went on, and on and on – she was overcome . . . she was crying.

*Id.* at 4. In response, Defendant Sheheryar Alam Qazi states:

> Now that poor guy is even more this thing . . . That poor guy is even more, over this matter, is . . . he says, 'I am fed up with the world . .. that, man I, uh [. . .] he is-he is just like a guest in this world. May Allah forgive me. We should have

> had the treatment [treated him] like our grandmother and grandfather, when they were on this thing . . . like laying on their deathbeds. [. . .] We should have dealt out that kind of treatment to him, so that he may have thought, he is a guest. He-he [. . .] In a way, he has given up on himself and is waiting for a-a-a . . . because that is why he does not try to get . . . uh . . . doesn't get a permanent job so that, 'I don't get too tied up with something else and forget about God's work . . . I don't let this happen – uh [. . .] so I don't get . . . [interested] in worldly matters. That poor guy is fed up with the world.

*Id.* at 5. His wife's responses focused on the strain between her mother- and brother-in-law. She did not address her husband's statements about her brother-in-law's statements. *See id.* at 6-12. The Court finds that there is insufficient evidence from this conversation to show that she was aware of any actual plans to commit Jihad in existence, let alone that she was complicit with or supported them.

Accordingly, the evidence of any involvement on the part of Defendant Sheheryar Alam Qazi's wife, before November 23, 2012, does not rise to the level of involvement of the spouse recognized in *Short*. There is insufficient evidence that she engaged with any of the Qazi brothers' alleged planning, and there is insufficient evidence that she witnessed any planning with approbation. Her alleged involvement prior to that date amounts to maintaining the home where the Qazi brothers were living. *See Bey*, 188 F.3d at 6 (holding "the government must produce evidence of a spouse's complicity," and wife's admissions in drug conspiracy case that she provided phone messages to defendant, wired food money to him, and drove him to the bus station "could be evidence of nothing more than mundane incidents of their marital relationship"). *Cf. United States v. Hill*, 967 F.2d 902, 912 (3d Cir. 1992) (holding that "joint participant" exception applied in case for drug and firearm offenses where wife contacted parole authorities, accepted deliveries of drugs, informed husband of deliveries, and counted drug proceeds).

The Government has not shown that Defendant's Sheheryar Alam Qazi's wife was an "unindicted co-conspirator" at the time the martial communications took place on August 24, August 29, September 7, and September 10, 2012.  *See, e.g.*, *United States v. Pielago*, 135 F.3d 703, 720 (11th Cir. 1998) ("Mere speculation as to the interpretations of words used by the defendant is insufficient evidence to link the defendant to a conspiracy. . . . Similarly, a defendant's association with conspirators and her knowledge of the conspirators' actions are not themselves sufficient proof of participation in a conspiracy.") (citing *United States v. Young*, 39 F.3d 1561, 1565-66 (11th Cir. 1994); *United States v. Calderon*, 127 F.3d 1314, 1326 (11th Cir. 1997)).  *See also United States v. Lyons*, 53 F.3d 1198, 1201 (11th Cir. 1995) ("Mere presence, guilty knowledge, even sympathetic observation have all been held by this court to fall short of the proof required to support [a] conviction [for conspiracy.]  A showing of *knowing participation* is required.") (emphasis in original); *United States v. Villegas*, 911 F.2d 623, 630 (11th Cir. 1990) ("Knowing participation in a conspiracy, however, cannot be proved solely by a family relationship or other types of close association.").  Accordingly, the Motion is granted with respect to these conversations.

As for the remaining conversations, the Government asserts that it will prove that Defendant Sheheryar Alam Qazi and his wife concealed Defendant Raees Alam Qazi's whereabouts and activities after he left for New York City on November 23, 2012, to select a target for his violent jihad.  The Court finds this is sufficient evidence to show that Defendant Sheheryar Alam Qazi and his wife were joint participants in criminal activity, and accordingly, all marital communications after this concealment are not privileged.  The Court reserves ruling on the two November 24, 2012 conversations until the Government proffers when exactly this concealment took place.

14

## IV. Conclusion

Being fully advised, it is **ORDERED AND ADJUDGED** as follows:

1. Magistrate Judge O'Sullivan's Report and Recommendation, **ECF No. [264]** is hereby **ADOPTED IN PART** and **REJECTED IN PART**;

2. Defendant Sheheryar Alam Qazi's Objections, **ECF No. [265]**, are **SUSTAINED IN PART** and **OVERRULED IN PART**;

3. Defendant Sheheryar Alam Qazi's Motion to Exclude Martial Confidential Communications, **ECF No. [43]**, is **GRANTED IN PART** and **DENIED IN PART**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 18th day of February, 2015.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

cc:   counsel of record